**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

✓ FILED    ___ ENTERED
___ LOGGED    ___ RECEIVED

Jan 09, 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ MD ___ Deputy

| | |
|---|---|
| United States of America, )| |
| )| |
| Plaintiff, )| |
| )| |
| v. )| **Case No. 20-po-331-GLS** |
| )| |
| Curtis Power, )| |
| )| |
| Defendant. )| |
| ————————————————————————) | |

## MEMORANDUM OPINION

Defendant Curtis Power ("Defendant" or "Mr. Power") has been charged with an offense allegedly committed on the campus of the National Institutes of Health ("NIH"), the possession of a firearm, in violation of 45 C.F.R. § 3.42(g). (ECF No. 1).

Pending before the Court is the Defendant's "Motion to Dismiss Citation Under the Second Amendment" ("the Motion") (ECF No. 22). The issues have been fully briefed, *see also* ECF Nos. 27, 28, and this Court finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth more fully below, Defendant's Motion is **DENIED.**

### I.    FACTUAL BACKGROUND

On November 8, 2019, the Defendant drove his vehicle to the security checkpoint at the NIH campus and attempted to enter to make a delivery. When the Defendant entered the vehicle inspection lane, NIH security stopped his vehicle and conducted a search. During the search, NIH security discovered a weapon in the center console of the Defendant's vehicle. Thereafter, the Defendant was arrested, given a citation, and released.[1]

---

[1] The factual summary is drawn from ECF Nos. 1, 22, and 27. The facts do not appear to be in dispute.

## II.   PROCEDURAL BACKGROUND

On January 22, 2020, the Defendant appeared in court for his initial appearance. (ECF No. 2). On September 6, 2022, Defendant filed the Motion. On October 5, 2022, the government filed a "Response in Opposition to Defendant's Motion to Dismiss." (ECF No. 27) ("Opposition"). On November 9, 2022, the Defendant filed a Reply in support of his Motion. (ECF No. 28) ("Reply").

## III.   MOTION TO DISMISS

In the Motion, the Defendant seeks dismissal of the possession of a firearm charge on the grounds that the citation violates his rights under the Second Amendment of the United States Constitution.

A Defendant may file a pretrial motion to dismiss the criminal charges pending against him, including in an instance where he alleges that there is "a defect in the institution of the prosecution."[2] Fed. R. Crim. P. 12(b)(1), (b)(3)(A); *see also United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

## IV.   DISCUSSION

### A.  The Regulation and the Second Amendment

According to 45 C.F.R. §3.42(g):

> No person [on the NIH campus] other than a specifically authorized police officer shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed. Upon written request, the Director may permit possession in living quarters of antique firearms held for collection purposes, if the Director finds that the collection does not present any risk of harm.

45 C.F.R. § 3.42(g).

---

[2] In addition, "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (finding that respondents failed to shoulder "heavy burden" of demonstrating facial unconstitutionality of the Bail Reform Act).

The Second Amendment provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.

### B. Post-*Bruen*: History as a Guide to Firearm Regulation

The Defendant argues that Section 3.42(g) ("regulation at issue" or "§ 3.42(g)") is unconstitutional per the Supreme Court's ruling in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

In *Bruen*, the Supreme Court found that "intermediate scrutiny" and "strict-scrutiny" balancing tests historically used by the circuit courts to determine the constitutionality of a law do not apply in the Second Amendment context. *Id.* at 2127. Thus, *Bruen* specifically abrogated the approaches taken by circuit courts across the nation. *See, e.g.*, *Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).

In particular, the *Bruen* majority held that the appropriate analysis when considering the constitutionality of firearm regulations is to determine whether the law bars conduct that the "plain text of the Second Amendment" protects. 142 S. Ct. at 2126. If the plain text of a Constitutional Amendment protects the relevant conduct, then the government must demonstrate that the operative regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. To do so, the government must point to historical evidence that the regulation is consistent with historical tradition. *Id.* If the regulation addresses a societal problem that existed at or about the time of this Country's founding, then historical evidence can include "distinctly similar" historical regulations addressing the founding-era societal problem *Id.* However, if no such

regulations historically existed, or different regulations existed that addressed the same societal problem then the challenged regulation is likely unconstitutional. *Id.*

The *Bruen* majority also opined that if the challenged regulation seeks to address a societal problem "unimaginable" at the time of this Country's founding, then the government may rely on analogical reasoning and identify regulations that are "relevantly similar" to the one at issue. *Id.* at 2132. The Supreme Court identified the scope of appropriate analogical comparisons, finding that the government is only "require[d] to identify a well-established and representative historical analogue, not a historical twin." *Id.* In assessing analogical comparisons, the Supreme Court cautioned lower courts to neither uphold "every modern law that remotely resembles a historical analogue," nor reject every challenged regulation for not having a "historical twin." *Id.* at 2133.

Even while expanding upon this new test, the *Bruen* majority reaffirmed the "longstanding" laws prohibiting the possession of firearms in "sensitive places," such as schools and government buildings. *Id.*; *see also District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). While outlining its view on the relationship between analogical reasoning and "sensitive places," the Supreme Court held that courts "*can use analogies* to [historical] regulations of 'sensitive places' to determine if those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen* at 2133 (emphasis added).

With this in mind, the Court analyzes *Bruen* and later the parties' arguments related to the regulation at issue.

### C. Argument

In his Motion, the Defendant advances three arguments. First, that 45 C.F.R. § 3.42(g) violates "his Second Amendment right to keep and bear arms," as the plain text of that Amendment renders presumptively unconstitutional a total ban on firearm possession. Relatedly, the Defendant avers that the government "will be unable to rebut that presumption." Second, that "as of 1791" no "historical tradition" existed that completely prohibited "individuals from possessing firearms on all federal lands." Third, NIH does not "qualify as a 'sensitive place,'" as such a designation, to the extent that it existed at the time of the Country's founding, was limited to places where "core functions of government were performed." According to the Defendant, NIH is not one of those "sensitive places." (Motion, p. 10).

The government advances two arguments in defense of 45 C.F.R. § 3.42(g). The government asserts that the NIH campus is a "sensitive place," which, pursuant to *Bruen*, means that the regulation is constitutionally valid. Also, the government argues that the Property Clause of the Constitution gives it plenary authority to regulate conduct on federal property, preventing court intervention. (*See generally* Opposition).

The Court will address both of these arguments, starting first with the "sensitive places" doctrine.

### 1.  "Sensitive Places" Doctrine

Regarding the sensitive places doctrine, the Defendant contends that: (1) the *Bruen* Court's discussion of "sensitive places" is dicta and not controlling law; and (2) the NIH campus does not qualify as a sensitive place under *Bruen* as it does not host "core government functions" or "serve as a center of government deliberations." In its Opposition, the government asserts that 45 C.F.R. § 3.42(g) is constitutional because the NIH is a "sensitive place."

a.      *Sensitive Places Doctrine: A Longstanding Principle, Not Dicta*

In *Bruen*, the Supreme Court reiterated its prior holdings in *Heller* and *McDonald*, in which the Supreme Court referred to the "longstanding" laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786 (repeating the "assurances" outlined in *Heller* regarding the constitutionality of "longstanding" laws forbidding firearms in sensitive places).

The government's first sensitive places argument is that the Supreme Court in *Bruen* and *Heller* categorically defined government buildings such as the NIH as sensitive places. (Opposition, pp. 9, 12). The Defendant asks this Court to ignore those portions of *Bruen* and *Heller*, arguing that the "sensitive places" language is legally unsupported dicta. (Motion, pp. 12-14). The Defendant correctly notes that lower courts are to "give great weight" to Supreme Court dicta. *See, e.g., N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016). However, the Defendant suggests that the present dicta ought to be ignored because it is not accompanied by adequate analysis. (Motion, p. 13).

The Court finds the Defendant's argument unpersuasive. First, the Court finds that the "sensitive places" passage in *Bruen* is more than unreasoned dicta announcing a new proposition. Instead, the language pertaining to sensitive places appears as reinforcement for a longstanding principle, i.e., the Supreme Court opines on a history that is already "settled," and is not offering a new doctrine. *Bruen*, at 142 S. Ct. at 2133-34.

Alternatively, assuming that the language in *Bruen* and *Heller* is dicta, the Court finds that it constitutes the kind of dicta that is of great value to lower courts. *See Myers v. Loudoun Cty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005) ("Although we are not bound by dicta or separate opinions of the Supreme Court, 'observations by the [Supreme] Court … constitute the sort of

6

dicta that has considerable persuasive value in the inferior courts'") (quoting *Lambeth v. Bd. of County Comm'n*, 407 F.3d 266, 271 (4th Cir. 2005)). Not only does the *Bruen* Court refer to the sensitive places doctrine as a "longstanding" tradition, but the Supreme Court also significantly analyzes or further expounds on the doctrine, removing it from the category of unreasoned dicta. *See Bruen*, 142 S. Ct. at 2133-34.

Accordingly, the Court will proceed with its analysis of whether NIH qualifies as a sensitive place.

> b.      *Analysis of the Sensitive Places Passage in Bruen*

The Defendant also argues that the NIH does not qualify as a sensitive place because it is not a "center for government deliberation" nor is it a place that hosts "core government operations." (Motion, pp. 18-20; Reply, pp. 14-15). In support, the Defendant directs the Court to the sources that the Supreme Court cited when discussing the sensitive places doctrine, suggesting that the analysis within those sources reflects the confines and limits of the doctrine. *See* D. Kopel & J. Greenlee*, The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018); *United States v. Bruen*, No. 20-843, Brief for Independent Institute as *Amicus Curiae* 7. According to the Defendant, the historical record and the sources cited by the Supreme Court only support a definition of a "sensitive place" that includes facilities such as polling places, schools, legislative buildings, and courthouses. (Motion, pp. 18-20).

On the other side of the ledger, the government asserts that the "sensitive places" language in *Bruen* plainly applies to the NIH, as it is a government building. Separately, the government asserts that the NIH is similar to relevant historical analogues. In particular, the government maintains that the *Bruen* and *Heller* opinions list "government buildings" as sensitive places, which means, by definition, the NIH qualifies as such, because it is a campus comprised of dozens

of government buildings. (Opposition, pp. 10-12). Alternatively, the government's view of the sensitive places doctrine focuses on connecting, through analogy, the NIH to other places that have been historically regulated and where firearm bans were appropriate.

The dispute between the parties boils down largely to differences in how the plain text of *Bruen* should be interpreted.

The pertinent language within *Bruen* reads as follows:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited— e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Bruen*, 142 S. Ct. at 2133-34 (internal citations omitted). Therefore, to ultimately resolve the Motion, the Court closely analyzed this "sensitive places" passage, sentence-by-sentence.

The first sentence reads:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."

*Bruen*, 142 S. Ct. at 2133-34. In this sentence, the Supreme Court gives initial insight into how to define a sensitive place. The *Bruen* Court does not explicitly define the phrase, opting instead to provide examples. Specifically, the Supreme Court identified sensitive places as places "such as" "schools" and "government buildings."[3] Notably, these examples are unqualified—the *Bruen*

---

[3] "Such as" is defined as: (1) for example; or (2) of a kind that; like. *See* oxfordlearnersdictionaries.com, https://www.oxfordlearnersdictionaries.com/us/definition/english/such#such_idmg_ (last visited Nov. 28, 2022). Relatedly, as applicable here, "like" is defined as similar to somebody/something. *See* oxfordlearnersdictionaries.com,https://www.oxfordlearnersdictionaries.com/us/definition/english/like_1?q=like (last visited Nov. 28, 2022). The first definition, "similar to somebody/something," demonstrates that the language used by the Supreme Court is not, syntactically, restrictive.

Court did not narrow the applicability of these examples in any way. *Id.; see also Heller*, 554 U.S. at 627, n. 26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive"). Nowhere in this passage nor at any other point in the opinion does the *Bruen* Court hold, e.g., that only "elementary schools" or "middle schools" are sensitive places. The same is true for government buildings. Nowhere in *Bruen* (nor in *Heller*, for that matter) is the definition of "sensitive places" narrowed to government buildings devoted to, e.g., national security or the exercise of political functions. Put another way, schools and government buildings are presented as broadly as possible, allowing the reader to consider all possible subtypes that fall within those two examples. *See Bruen*, 142 S. Ct. at 2133-34. If the *Bruen* Court intended the first sentence to restrict the applicability of the "sensitive places" doctrine to, e.g., a small subset of government buildings, the Supreme Court could have explicitly made that limitation. In the absence of a clear limitation, the Court cannot accept a narrow interpretation of the first sentence.

The second sentence of the passage reads:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions.

*Bruen*, 142 S. Ct. at 2133-34. This sentence serves the limited purpose of demonstrating that there are few historical examples of sensitive places legislation that altogether prohibited carrying weapons in sensitive places. The Court does not interpret this second sentence to stand for the proposition that the scope of the sensitive places doctrine is limited to the set of examples that the Supreme Court identified. Such an interpretation does not make sense because the first sentence

presented examples of sensitive places using expansive language ("such as"), allowing for examples that include or are "similar to" those provided. If the second sentence were intended to narrow the list of sensitive places, the first and second sentences would contradict each other. Thus, the Court reads the second sentence as holding: (1) that the doctrine can apply expansively; (2) the historical record does not yield many examples of legislators passing laws under this doctrine; and (3) the lawfulness of regulations pertaining to sensitive places has never been disputed.

In the third sentence, the *Bruen* Court refers back to the historical pedigree of the sensitive places doctrine:

> We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.

*Bruen, supra,* at 2133-34. The Court finds that it is clear that this sentence merely serves to reinforce the notion that the sensitive places doctrine and the examples the Supreme Court provided are consistent with the Second Amendment.

The fourth and final sentence of the passage provides guidance on how analogies, if necessary, may be used to demonstrate that a location qualifies as a sensitive place:

> And courts can use analogies to those historical regulations of "sensitive places" to determine those modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Bruen*, at 2133-34. Here, the *Bruen* Court holds that analogical reasoning may be used to determine if a particular location qualifies as a sensitive place.[4] This gives the Court the formula for

---

[4] The Defendant asserts that analogous reasoning is inappropriate because it may only be used when analyzing a societal problem that was "unimaginable" at the time of the founding. (Reply, p. 15). To support this argument, the Defendant cites to the following passages within *Bruen*:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second

analyzing, if necessary, what constitutes a "sensitive place" in the present day, reinforcing that the examples listed in the first and second sentences can be used to identify other sensitive places which are "similar."

In sum, this Court reads *Bruen* as holding that: (1) schools and government buildings are examples of sensitive places, not the exhaustive list of what sensitive places are; (2) there are only a few Eighteenth- and Nineteenth-Century regulations that altogether prohibited weapons in sensitive places, which are also defined to include legislative assemblies, polling places, and courthouses; (3) banning weapons in sensitive places has a longstanding historical pedigree, which

---

Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. . . .

Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

The Defendant argues that the "unimaginable" requirement applies with equal force to this portion of the Supreme Court's discussion on "sensitive places." (Reply, p. 15). This belief is predicated on a misreading of the Supreme Court's opinion. As stated previously, when discussing sensitive places, the *Bruen* Court states that analogies may be used to identify "new and analogous" sensitive places. When generally discussing the use of analogies, the Supreme Court says that analogies are used when a regulation is intended to address a societal problem which was unimaginable at the time of the founding. *Bruen*, 142 S. Ct. at 2132-33. If the regulation at issue seeks to combat a societal problem that was not "unimaginable" at the time of the founding, the Supreme Court outlines a different process by which a court can determine its constitutionality. *Id.* However, that limitation cannot be applied to regulations protecting sensitive places. First, sensitive places regulations have a purpose that is well-defined and was certainly familiar to early Americans at the time of the Country's founding—to protect a sensitive place. Such regulations do not implicate technological advancements unknown to early Americans, nor some type of societal problem that is unique. Sensitive places, generally, have always existed and always demanded protection. *See e.g.*, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018). It is inconceivable that the Supreme Court would in one breath say that regulations intending to remedy known-societal problems cannot—under any circumstances—utilize analogies, and in another say that regulations of sensitive places can be upheld through the use of analogies. It cannot be the case that the Supreme Court intended to contradict itself; accordingly, the Court will not interpret the *Bruen* opinion in a way that would force such a contradiction.

In sum, the Court finds that the *Bruen* majority intended to outline a process that is used specifically in the context of assessing the constitutionality of a "sensitive places" regulation. As applied to the "longstanding" and accepted practice of regulating sensitive places, the Court finds that the *Bruen* opinion allows for the use of analogies when assessing regulations pertaining to sensitive places.

does not violate or run afoul of the Second Amendment; and (4) when necessary, the Court may use analogical reasoning to identify new sensitive places.

With that understanding, the Court first identifies what the NIH is before turning back to the parties' arguments.

c.      NIH: A Brief History

To understand the NIH, the Court finds it helpful to track its history and its modern function.

In 1887, the NIH began as a small laboratory as part of the Marine Hospital Service, which preceded the United States Public Health Service. The original purpose of the organization was to provide medical care to sea bearing merchants. The NIH did not steer toward one of its most prominent modern responsibilities—disease research—until 1901 when Congress authorized $35,000 for the investigation of "infectious and contagious diseases and matters pertaining to the public health." Over the years, the research conducted by the agency has spanned across areas such as infectious diseases, vaccine development, military pilot capabilities (and ways to prevent pilots from losing consciousness at high altitudes), genome sequencing, and countless other areas. *See A Short Story of the National Institute of Health*, NIH, https://history.nih.gov/display/history/A+Short+History+of+the+National+Institutes+of+Health (last visited Nov. 30, 2022).

Today, NIH operates under the Department of Health and Human Services ("HHS"). The NIH operates pursuant to congressional authorization to advance biomedical research to improve the health of the United States. Annually, the NIH receives nearly fifty billion dollars in funding and is led by the Director of the NIH ("Director"), who is appointed by the President of the United States and confirmed by the United States Senate. Nearly 19,000 employees work under the

Director. *See NIH Reauthorization*, NIH, https://www.nih.gov/about-nih/who-we-are/nih-reauthorization (last visited Dec. 1, 2022); *NIH Workforce Profile*, NIH, https://www.edi.nih.gov/people/resources/advancing-racial-equity/nih-workforce-profile-fy21q02 (last visited Nov. 30, 2022); Cong. Resch. Serv., National Institutes of Health (NIH) Funding: FY1996-FY2023, at 11-13 (2022), https://sgp.fas.org/crs/misc/R43341.pdf.

The NIH spans across 21 different institutes, all of which are devoted to some form of biomedical research. In addition, the NIH is home to libraries, a clinical center, and multiple auditoriums where the NIH hosts lectures. Notably, the NIH houses an immense database of genomic sequencing information and receives and ships hazardous materials such as nucleic acids, human pathogens, and infectious materials. *Institutes at NIH*, NIH, https://www.nih.gov/institutes-nih (last visited Nov. 20, 2022); *Biological Materials Shipping*, NIH, https://ors.od.nih.gov/sr/dohs/safety/laboratory/BioSafety/Pages/shipping_biological_material.aspx (last visited Dec. 1, 2022). In part for that reason, the NIH is a highly secure, closed campus, which requires "all visitors [to] enter through the NIH Gateway Center." In addition, visitors must "submit to a vehicle or personal inspection." Visitor inspections are conducted by NIH police. *Campus Access and Security*, NIH, https://www.nih.gov/about-nih/visitor-information/campus-access-security (last visited Dec. 21, 2022).

Reflecting on the history and modern function of the NIH, the Court is able to extract a few core characteristics: the NIH is a secured, academically-oriented and government-directed institution with a particular focus devoted toward the advancement of scientific inquiry and treatment of patients.

Now that the Court has identified the core characteristics of the NIH, it turns back to the parties' arguments.

> d.      *The Court Rejects the Defendant's Narrow Definition of Sensitive Places*

As stated previously, Defendant's first argument is that the *Bruen* opinion limits sensitive places to "center[s] for government deliberation" or places that host "core government operations." (Motion, pp. 9, 12, 19). The Court finds that such a restriction is unsupported by the language of *Bruen*. As held previously, the *Bruen* Court identifies examples of sensitive places without any explicit limitation on the definition. In the absence of any qualifiers, any and all places which plainly fall within the categories the *Bruen* Court provided, schools and government buildings, are presumptively sensitive places. *See* Section IV.C.1.b, *supra*. As a result, this Court agrees with the government's argument that the *Bruen* Court blanketly defines "government buildings," and other locations that are "similar to" government buildings, as sensitive places. (Opposition, p. 11, citing to *Bruen* at 2133).

The Court disagrees with Defendant's argument that the *Bruen* Court's citation to academic sources somehow implies that the *Bruen* Court intended its analysis to mirror and be limited by the analysis in those sources. (Motion, pp. 18-19). Rather, the two citations occur in the same sentence in which the Supreme Court cites to examples of sensitive places. The citations are intended to point the reader to the examples that the *Bruen* Court could find existed historically, not indicate that those examples represent the entire universe of sensitive places. *Bruen*, at 2133. The Defendant's interpretation, if adopted, would directly contradict the *Bruen* Court's usage of the phrase "such as," and the instruction that courts can use analogical reasoning to identify "new and analogous sensitive places." *Id.* Thus, there is no basis to read *Bruen* as requiring a government building deemed a sensitive place to be one that is a "center for government deliberation" or a place that hosts "core government operations."

The Court further finds that neither *Heller* nor any other Supreme Court opinion issued to date holds that government buildings deemed sensitive places are limited to "center[s] for government deliberation" or places that host "core government operations."[5] It appears that the Defendant independently formulated that limitation.[6]

In sum, the Court finds Defendant's definition of what constitutes a "sensitive place" too narrow and not supported by the law. Per the textual analysis performed by this Court, because the NIH is a government building(s), it is a sensitive place. Since there is a long historical tradition of banning weapons in sensitive places, Section 3.42(g) does not violate the Second Amendment.

     *e.*    *Analogical Reasoning-NIH Can Prohibit Carrying Weapons on Its Campus*

In the alternative, assuming *arguendo* that the Court has read *Bruen's* definition of sensitive places too expansively to include all government buildings without restriction, then the Court still finds that analogical reasoning supports the constitutionality of the regulation at issue.

The Defendant contends that the government may not rely upon analogical reasoning and, even assuming that analogical reasoning is appropriate, the government fails to demonstrate that its analogies are "relevantly similar." (Reply, p. 15).

As a preliminary matter, the Court has already explained that the *Bruen* opinion allows for analogical reasoning when identifying sensitive places. So, to determine whether Section 3.42(g) is consistent with historical regulations of sensitive places, the Court now considers if any of the analogies presented by the government adequately establish the NIH as a sensitive place.

---

[5] Nor does the Defendant cite any case law stating that it is permissible to bring firearms onto federal property.

[6] Although there is little case law defining sensitive places, some courts have discussed the issue and identified sensitive places that go beyond places that host "core government operations." For example, in *United States v. Dorosan*, Criminal Action No. 08–042, 2008 WL 2622996 at *6 (E.D. La. June 30, 2008), the court upheld a firearm ban on property belonging to the United States Postal Service. *See also Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (finding that a post office falls within the definition of a sensitive place as it is a government building). The *Dorosan* court found prohibitions on "federal and/or postal property" have a longstanding history and have been upheld. *Id.* Postal property certainly falls outside of the limitation described by the Defendant.

The government attempts to analogize the NIH to: (1) Middle Age-era laws pertaining to officials under the Crown of England performing their duties; (2) founding-era statutes pertaining to public officials performing their duties; (3) private property; and (4) college campuses. (Opposition, pp. 9-11). The Court finds Analogy No. 1 and Analogy No. 3 unconvincing and will address those analogies first.

To support Analogy No. 1, the government cites the Statutes of Northampton, enacted in 1328, which prohibited carrying firearms "before the King's justices" and "other of the King's ministers doing their office." 2 Edw. 3, c. 3 (1328). The government argues that NIH employees are government officials, akin to the "King's ministers" who go about performing their duties within the confines of the NIH campus. (Opposition, p. 10). In turn, since the Statutes of Northampton ("the Statutes") treated such locations as a sensitive place, limiting the carrying of firearms therein, the instant regulation is proper.

In analyzing the persuasive value of the Statutes, the Court is inclined to agree with the Defendant's contention that the *Bruen* majority found that the Statutes are not probative in terms of identifying the historical traditions at the time of the founding. In *Bruen*, when discussing the persuasive value of the Statutes the Supreme Court "cautioned that the English common law 'is not to be taken in all respects to be that of America'" and that "'[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted' not as they existed in the Middle Ages." *Bruen*, 142 S. Ct. at 2139. Subsequently, after canvassing the historical record, the Supreme Court found that the Statutes did little to demonstrate a tradition of firearm regulation in early America. *Id.* at 2139-40. As a result, this Court will not credit the Statutes as authorities in support of the government's analogy.

16

In Analogy No. 3, the government analogizes the NIH to private property. The government asserts that founding-era laws prohibiting hunting on another person's property without permission is "relevantly similar" to the instant regulation where the government operates as a property owner. (Opposition, p. 11). The Defendant argues that these laws are not relevantly similar. (Reply, p. 21). On this matter, the Court agrees with the Defendant. As the Supreme Court cautioned, "'[e]verything is similar in infinite ways to everything else.'" *Bruen*, 142 S. Ct. at 2132. So, the Court must avoid finding that analogies are "relevantly similar" where the connection is overly superficial or general. In this case, not only does the Court find that the connection is superficial, but also finds that the express purpose of the laws cited by the government differs greatly from the regulation at issue. The cited laws were intended to limit hunting on private property. The instant regulation, however, has nothing to do with hunting. The Court cannot find the government's analogy sufficient to carry the government's burden without entirely undermining the analogical framework established in *Bruen*. Thus, the Court similarly finds that the government cannot carry its burden through use of this analogy.

Having dispensed of the unavailing arguments, the Court will now address Analogy No. 2 and Analogy No. 4. In Analogy No. 2, the government proposes that founding-era statutes treated locations where public officials performed their duties as sensitive places. (Opposition, p. 10, n. 2). The government identified the following statute from Virginia in 1786:

> No man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and thir [sic] bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the

commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Duke's Center for Firearm's Law, *1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays*, DUKELAW, https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/ (last visited Dec. 1, 2022). In addition, the government observed the following statute in North Carolina in 1792, which incorporated the language of English law:

> No man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, 60-61 (1792). The Defendant addresses the Virginia statute in his Reply, stating that in *Bruen* the Supreme Court found that this statute sought to protect individuals against others bearing firearms in a way that spreads "fear" or "terror." (Reply, p. 20). The Court agrees with this assessment but finds that the Supreme Court in *Bruen* discussed this statute while assessing a restriction on the right to public carry. The Supreme Court did not, however, address the statute in the context of a sensitive places analysis. *See Bruen*, 142 S. Ct. at 2144-45. Thus, the Supreme Court did not venture to address the portion of the statute that speaks directly to the prohibition on bringing "force and arms" before "ministers" "doing their office." The discussion in *Bruen* did not implicate that issue and the Court disagrees with the Defendant's assessment that the statute cannot be used to uphold a sensitive places-based regulation.

18

The North Carolina statute, according to the Defendant, also fails to support the government's argument because the court in *State v. Huntly*, 25 N.C. 418 (1843), held that the statute did not impose an offense merely for possessing a weapon. (Reply, p. 20). This point misses the mark because, again, the court in *Huntly* is not addressing the part of the statute that refers to bringing "force and arms" in the presence of "ministers doing their office." Instead, the *Huntly* court is discussing the portion of the statute addressing the unlawful nature of carrying weapons while perpetuating an "affray." *Huntly*, 25 N.C. at 421-22. Similarly, the court's finding that "carrying of a gun per se constitutes no offence [sic] … [f]or any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun" does not disqualify the government's argument. *See Id.* at 422-23. Instead, it is a simple legal truism. Axiomatically, if an individual carries a firearm in compliance with the law, then there is no offense. However, carrying a firearm in violation of the law, for example, as described in the North Carolina statute, in a location where an official is performing his duty, is an offense.[7]

Accordingly, the Court finds that the NIH regulation, which limits the ability of individuals to bring firearms into areas where NIH employees are performing their duties is sufficiently analogous to the Virginia and North Carolina founding-era regulations banning "force and arms"

---

[7] The Defendant also argues that even if the Court accepts the above-mentioned statutes as persuasive toward establishing the NIH as a sensitive place, the government must bring forward more statutes to satisfy its burden. On this argument, the Defendant cites the *Bruen* majority where it says, "we doubt that three colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen*, 142 S. Ct. at 2142. The Defendant claims that this phrase requires the government to offer more than a few statutes to establish the NIH as a sensitive place through analogy. (Reply, pp. 17, 21). The Court disagrees. Here, too, the Court finds that the Defendant's assertion is contextually inaccurate. In the quoted language, the *Bruen* majority is discussing an issue that is not relevant to this Court's consideration. In this case, the Court is assessing whether the NIH can be analogized to a sensitive place. It is not, however, determining whether there is sufficient proof to find that a historical tradition of regulating sensitive places exists. This Court's textual analysis of *Bruen* is that the Supreme Court announced that the sensitive places doctrine is part of a "longstanding" and undisputed tradition. *See Bruen*, 142 S Ct. at 2133-34. In contrast, the *Bruen* majority sought to determine if the *historical tradition itself* for public carry regulations existed. *Id.* at 2142. At no point did the *Bruen* majority claim that a certain quantity of historical examples was necessary when comparing a regulation to another that exists within an already established historical tradition.

in the presence of the "ministers" and "justices" performing their duties. On the NIH campus, the presidentially appointed Director has an office and performs his duties. Furthermore, thousands of public officials, funded by congressional authorization and under the authority of the Director perform their duties. Additionally, in both cases there is the logical interest of preventing the disruption of government vis a vis the introduction of firearms, potentially putting those executing government functions in harm's way. Therefore, under *Bruen*, the Court finds that the government can sustain its burden through this analogy.

Finally, in Analogy No. 4 the government relates the NIH to college campuses and founding-era restrictions that prevented firearms on college campuses. The government asserts that the NIH is a "research institution not unlike a university." (Opposition, pp. 11-12). Principally, the Defendant counters the government's argument by suggesting that the regulations prohibiting firearms on college campuses are not "relevantly similar" to the instant regulation. First, the Defendant says that the laws cited by the government only applied to students and did not present a comparable burden to the regulation at issue, which prohibits possession entirely. Second, the Defendant asserts that the government did not identify why the regulations were imposed and therefore failed to identify how the laws are "relevantly similar." (Reply, pp. 20-21).

First, the Court holds that Defendant's suggestion that § 3.42(g) imposes a greater burden than firearm prohibitions on college campuses is overstated. Historical firearm regulations pertaining to college campuses represented blanket firearm bans, which applied to every student. At the University of Georgia, where firearm restrictions were imposed in or about 1810, there were no exceptions, and it applied in "any case whatsoever." *The Minutes of the Senatus Academicus 1799-1842*, https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf [https://perma.cc/7RJR-9JYR] (last visited Jan. 4, 2023). In places where there were

exceptions, like the University of North Carolina and the University of Virginia, a student could use firearms "with the permission of [f]aculty." *See, e.g.*, LAWS OF THE UNIVERSITY OF NORTH CAROLINA 9 (1829) (stating that "no student shall keep a dog, or fire arms [sic], or gunpowder … nor shall he use fire arms without permission from some member of the Faculty"); *University of Virginia Board of Visitors Minutes October 4–5, 1824*, ENCYCLOPEDIA VIRGINIA, https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/ (last visited Jan. 4, 2023) (same). This sole exception further shows how the burden between these restrictions and § 3.42(g) is comparable as a similar exception appears in § 3.42(g). If an individual wishes to possess a firearm on NIH property, an individual, upon written request, has a chance to obtain the permission of the Director under certain circumstances. Moreover, the Court finds that the burden of the regulation at issue is reduced by the fact that it pertains solely to a particularized parcel of federal land and operates as no more than a partial limitation on where an individual may carry a firearm.

Furthermore, the Court finds that the Defendant's argument is defeated by the plain language of the *Bruen* opinion. As discussed, the Supreme Court included "schools" as one of the categories to which the sensitive places doctrine applied. *Bruen*, 142 S. Ct. at 2133. This Court detailed *supra* how a textual analysis of the opinion forces the conclusion that the *Bruen* majority intended "government buildings" and "schools" to be interpreted broadly. Applying that finding here, the Court determines that a regulation centered on a "college campus" falls under "schools" and within the sensitive places doctrine. Thus, the Court's responsibility is determining if the NIH is analogous to a college campus.

The Court does find that the NIH is similar to a college campus. The NIH is an institution that is staffed largely by academics. Within NIH grounds, lectures are hosted, scientific areas are

studied and researched, and there are things like libraries, auditoriums, and lecture halls. All of these elements are hallmarks of college campuses. The Court can identify similarities in terms of the population that tends to exist on both (academics), the activities that take place (research and lectures), and the buildings you will find (libraries, auditoriums, etc.). Security protocols, too, that are often present on college campuses are similar to NIH security protocols. Many college campuses have campus security or police, restrictions on visitor access, and designated areas where visitors must check-in prior to entry. *See, e.g.*, *Visitor Policies*, DEPAUL HOUSING, https://offices.depaul.edu/housing/resident-resources/housing-facilities/Pages/visitor-policies.aspx (last visited Dec. 21, 2022); JOHN M. REID, CALIFORNIA STATE UNIVERSITY CAMPUS SECURITY STANDARDS, https://www.csuchico.edu/up/_assets/documents/security-standards.pdf; *Public Safety*, FORDHAM UNIV., https://www.fordham.edu/student-life/safety-health-and-wellness/public-safety/ (last visited Dec. 21, 2022). As a result, the government satisfies its burden through this analogy as well.

In sum, the Court finds that the NIH is a sensitive place and that 45 C.F.R. § 3.42(g) properly regulates the carrying and possession of firearms on NIH grounds and does not violate the Second Amendment.[8]

---

[8] The Court notes that the government also asserts that the Second Amendment's plain text does not cover the Defendant's conduct because he was in a "highly regulated, closely-scrutinized, heavily guarded government research facility," not in the "general public." (Opposition, p. 9). The Court finds, consistent with the textual analysis contained herein, the government's claim is not supported by *Bruen*. The *Bruen* court broadly defines what it means to be "in public," defining "in public" as "outside the home." *Bruen*, 142 S. Ct. at 2122. ("We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*") (emphasis added). In addition, the government errors by suggesting that an initial assessment of whether the Second Amendment covers the Defendant's conduct is the same as performing a sensitive places analysis. The Supreme Court, in reaffirming the sensitive places doctrine, did not assert that sensitive places were not "in public." *Id.* at 2133. Instead, the Supreme Court said that regulations of sensitive places are permissible because they are part of a longstanding tradition and consistent with history. *Id.* Accordingly, the fact that the Defendant was in a "heavily guarded government research facility" does not allow this Court to find that the Second Amendment does not cover the Defendant's conduct. However, as discussed *supra*, it does reinforce the conclusion that the regulation at issue is constitutional as it applies to a sensitive place.

2.  <u>Property Clause</u>

The Property Clause of the Constitution provides that:

> the Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

U.S. CONST. art IV, § 3, cl. 2.

The Defendant asserts that the authority granted to Congress by the Property Clause is limited by the other portions of the Constitution, including the Second Amendment, and any action taken on federal property must still comply with the *Bruen* opinion. (Reply, pp. 2-3).

According to the government, however, because the NIH exists on federal land and Section 3.42(g) specifically imposes regulations on individuals who possess firearms on federal land, the regulation at issue passes constitutional muster. Namely, consistent with the Property Clause, Section 3.42(g) is a "needful Rul[e] and Regulatio[n] respecting the territory or other Property belonging to the United States." (Opposition, pp. 4-5). In support of its argument, the government points to various cases where courts have described Congress' authority to regulate public lands as "plenary." *See, e.g., United States v. Masciandro*, 638 F.3d 458, 473 (4th Cir. 2011).

It is true that some of the cases cited by the government do discuss the Property Clause in the context of firearm regulations. *See, e.g.*, *United States v. Dorosan*, *supra*, 2008 WL 2622996, at *3. In *Dorosan*, the district court denied the defendant's motion to dismiss the superseding bill of information on Second Amendment grounds, finding, in part, that the Property Clause provided the constitutional basis for a regulation prohibiting the possession of a firearm at a U.S. Post Office. The court found that "[b]eyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which, like those at issue in this case, are designed to maintain safety and order on government property." 2008 WL 2622996, at *3.

23

However, this Court does not find that the Property Clause serves as an independent basis for upholding the regulation at issue. Rather, the majority of the Property Clause cases cited by the government, which define Congress' authority under the Property Clause as "plenary," relate to federalism disputes, a fact not present here. *See, e.g., Kleppe v. New Mexico,* 426 U.S. 529 (1976); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917); *United States v. City & Cty. of San Francisco,* 310 U.S. 16, 18 (1940). Alternatively, even if the Court found persuasive this Supreme Court jurisprudence, the authority that the Property Clause gives to Congress is necessarily limited by the other parts of the Constitution, which includes the Second Amendment. *See United States. v. Comstock,* 560 U.S. 126, 134-35 (2010) ("a federal statute, in addition to being authorized by Art. I, § 8, must also 'not [be] prohibited' by the Constitution") (citing *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)); *see also New York v. United States*, 505 U.S. 144, 156 (1992) ("Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment"). Accordingly, even if the Court were to find that Congress is granted the authority to regulate conduct on the NIH campus through the Property Clause, that authority must withstand the Second Amendment rubric set forth in *Bruen*.

In sum, the Court finds that the Property Clause does not support the constitutionality of the regulation at issue.

## V.  Conclusion

For the reasons set forth herein, the Court holds that 45 C.F.R. § 3.42(g) does not violate the Second Amendment and that the Defendant's Motion, ECF No. 22, is **DENIED.**

A separate order will follow.

24

Dated:  January 9, 2023

_____/s/_____
The Honorable Gina L. Simms
United States Magistrate Judge